**DRUVEN PC**
JEFFREY C. MAYES (SBN 168846)
IOANA R. RĂDUCU (SBN 337485)
1925 Century Park E, Suite 1700
Los Angeles, CA, 90067
Telephone: 213-838-0048
Email: jmayes@druven.law
        iraducu@druven.law

Attorneys for Plaintiffs,
A4H, LLC, a California Limited Liability Company,
Alina Siert, an individual

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

A4H, LLC, a California Limited Liability
Company; Alina Siert, an individual,

            Plaintiff,

v.

SPIFFY FRANCHISING, LLC, a Delaware
Limited Liability Company; GET SPIFFY, INC.,
a Delaware corporation, Scot Wingo, an
individual; Karl Murphy, an individual; Connor
Finnegan, an individual; and DOES 1 through 20,
inclusive;

            Defendant.

Case No. 5:24-cv-01771

**COMPLAINT FOR DAMAGES**

**DEMAND FOR JURY TRIAL**

COMES NOW A4H, LLC ("A4H") and Alina Siert ("Alina") hereby complain of Spiffy Franchising, LLC and Get Spiffy, Inc. (collectively, "Spiffy"), and Scot Wingo ("Wingo"), Karl Murphy ("Murphy"), and Connor Finnegan ("Finnegan") (Wingo, Murphy, and Finnegan collectively, the "Individual Defendants"), and Does 1 through 20, inclusive (collectively, "Defendants") and allege as follows:

## THE PARTIES

1.      Plaintiff A4H, LLC is a limited liability company organized and existing under the laws of the State of California, having a principal place of business at 3979 Yerba Buena Avenue, San Jose, California 95121.

2.      Plaintiff Alina Siert was, at all times mentioned herein, a resident of San Jose, California. Alina was, at all times mentioned herein, the Chief Executive Officer and Manager of A4H. Unless otherwise indicated, Plaintiff A4H, LLC and Plaintiff Alina Siert will collectively be referred to as "Plaintiffs."

3.      Upon information and belief, Defendant Spiffy Franchising LLC is a limited liability company organized and existing under the laws of the State of Delaware, having a principal place of business at 4506 S Miami Blvd., Suite 150, Durham, North Carolina 27703.

4.      Upon information and belief, Defendant Get Spiffy, Inc. is a Delaware corporation, having a principal place of business at 4506 S Miami Blvd., Suite 150, Durham, North Carolina 27703.

5.      Upon information and belief, Defendant Scot Wingo ("Wingo") is a citizen and resident of North Carolina and was at all relevant times the Chief Executive Officer and Co-Founder of Spiffy. Wingo has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Defendants, including the acts and practices set forth in this Complaint. Wingo has advertised, marketed, distributed, or sold Spiffy franchises to consumers throughout the United States, including in this District. At all times material to the facts in this Complaint, Wingo formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Defendants. In connection with the matters alleged herein, Wingo transacts or has transacted business in this District

and throughout the United States.

6.      Upon information and belief, Defendant Karl Murphy ("Murphy") is a citizen and resident of North Carolina and was at all relevant times the President and Co-Founder of Spiffy. Murphy has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Defendants, including the acts and practices set forth in this Complaint. Murphy has advertised, marketed, distributed, or sold Spiffy franchises to consumers throughout the United States, including in this District. At all times material to the facts in this Complaint, Murphy formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Defendants. In connection with the matters alleged herein, Murphy transacts or has transacted business in this District and throughout the United States.

7.      Upon information and belief, Defendant Connor Finnegan ("Finnegan") is a citizen and resident of North Carolina and was at all relevant times the Vice President of Strategy at Spiffy. Finnegan has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Defendants, including the acts and practices set forth in this Complaint. Finnegan has advertised, marketed, distributed, or sold Spiffy franchises to consumers throughout the United States, including in this District. At all times material to the facts in this Complaint, Finnegan formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Defendants. In connection with the matters alleged herein, Finnegan transacts or has transacted business in this District and throughout the United States.

8.      The true names and capacities of defendants Does 1 through 20, inclusive, are unknown to Plaintiffs, who sue these defendants by fictious names. Plaintiffs will amend this complaint to allege the true names and capacities of these Doe defendants when ascertained. Plaintiffs are informed and believe, and thereupon allege, that Does 1 through 20 are each responsible in some manner for the events alleged in this complaint, and that they proximately caused damage to Plaintiffs by their conduct.

9.      Plaintiffs are informed and believe, and on that basis allege, that at all relevant times, each of the Defendants was the agent, affiliate, officer, director, manager, principal, alter-ego, and/or

employee of other defendants and each and all were at all times acting in the scope of the agency, affiliation, alter-ego relationship and/or employment; and actively participated in or ratified and adopted, or both, each and all the acts or conduct alleged, with full knowledge of all the facts and circumstances, including, but not limited to, full knowledge of each and every violation of Plaintiffs' rights and the harm and damage to Plaintiffs proximately caused thereby.

## NATURE OF THE ACTION

10.     Spiffy is a nationwide, app-based car service franchise providing a range of contactless, eco-friendly services, such as hand car washing, disinfection, detailing, oil changes, tire maintenance, and other related offerings. Spiffy was founded by Scott Wingo in 2014, with the contactless car care services developed soon thereafter. The company began offering franchises in 2020 at the start of the COVID pandemic.

11.     Alina and Matthew Siert (the "Sierts") operated a restaurant enterprise in the Bay Area. Alina was also an operations program manager at eBay from November 2012. In the Fall of 2020, as they looked for a new business endeavor, the Sierts were introduced to Spiffy through a former colleague that was working as an executive at Spiffy. One thing led to another, and, in November 2020, Spiffy's Co-Founder and President, Karl Murphy ("Murphy"), met with the Sierts and their then business partners, Eric and Lucille Sablan (the "Sablans"), in the Bay Area. During the meeting, Murphy fraudulently enticed the Sierts to become franchisees, claiming that Spiffy would become the "Amazon of car care" and representing that there was more customer demand than Spiffy could handle. During that visit, Murphy led the Sierts on a tour of Spiffy's "City Business Unit" in San Francisco, which Murphy represented as a highly profitable operation run by Google's autonomous driving technology, Waymo, Enterprise Rent-A-Car, and U-Haul, among others. Though Murphy's presentation impressed the Sierts, they would later discover that Defendants fraudulently inflated invoices to Waymo to increase profitability, and, as a result, Waymo terminated their relationship with Spiffy.

12.     Relying on Murphy's misrepresentations, as well as misrepresentations by Connor Finnegan, Spiffy's VP of Strategy, regarding Spiffy's profitability, business model and marketing

strategies, the Sierts were sold on Spiffy and formed A4H to operate as a Spiffy franchisee. Plaintiffs signed the Franchise Agreement on December 19, 2020.

13.     However, it is abundantly clear that Defendants fraudulently induced Plaintiffs into signing a franchise agreement with Spiffy through a series of fraudulent misrepresentations and concealed material facts.

14.     Based on continued misrepresentations made by Defendants, Alina left her successful job as an operations program manager at eBay in June 2021 and the Sierts sold their restaurant businesses to fully devote their efforts to the success of their Spiffy business.

15.     A4H is one of many franchisees victimized by Spiffy and its fraudulent business practices. A4H, like many Spiffy franchisees, agreed to invest in the Spiffy franchise system based on representations made by the Spiffy organization and their agents.

16.     At the time, Plaintiffs, as well as numerous Spiffy franchisees, lacked experience operating mobile vehicle care and service companies, a fact well known to and preyed upon by Defendants, who constantly assured Plaintiffs that no prior experience was needed to operate a Spiffy franchise successfully.

17.     Relying on Spiffy's fraudulent misrepresentations and concealed material facts, Plaintiffs, like many other Spiffy franchisees, made very substantial investments in opening the franchises, including: the initial franchise fees paid to Spiffy; custom vehicle leases; equipment purchases; working capital allocations; personal loans; and employee training. While these financial investments were (and continue to be) considerable, they pale in comparison to the time and energy devoted by Plaintiffs in pursuit of the "success" promised by Spiffy.

18.     As a result of Defendants' misrepresentations and violation of the California Franchise Investment Law ("CFIL") and other breaches of law, Plaintiffs seek recission, damages, costs, and attorneys' fees in an amount to be proven at trial.

**<u>JURISDICTION AND VENUE</u>**

19.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §1331, in

4

COMPLAINT

that this is a civil action arising under the laws of the United States, specifically the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. §1962).

20.     The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332.

21.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367.

22.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b)(2) at least because a substantial portion of the events complained of herein took place in this Judicial District.

23.     This Court has personal jurisdiction over Spiffy because it transacted business in the State of California, including in this District, with Plaintiffs pursuant to a franchise agreement that is the subject of this Complaint and because Spiffy registered with the California Department of Business Oversight to sell franchises in California.

24.     This Court has personal jurisdiction over Wingo because he has engaged in substantial, continuous, and systematic contacts with California, including in this District.

25.     This Court has personal jurisdiction over Murphy because he has engaged in substantial, continuous, and systematic contacts with California, including in this District.

26.     This Court has personal jurisdiction over Finnegan because he has engaged in substantial, continuous, and systematic contacts with California, including in this District.

## FACTUAL ALLEGATIONS

**A.     Spiffy Utilized Fraudulent Business Practices to Entice A4H to Become a Spiffy Franchisee**

27.     In the Fall of 2020, the Sierts were preparing to move on from their restaurant enterprise and were looking for a new business they could relate to in terms of the consumer space and making life easier for customers.

28.     The Sierts were part of Spiffy's target demographic: busy, suburban families in need of fast, efficient, and mobile vehicle services.

29.     The Sierts were introduced to Spiffy through Garrison Ramoso, then Spiffy's Vice President of Sales, via a post on LinkedIn. Alina worked with Ramoso previously at eBay, and she

5
COMPLAINT

trusted his business judgment.

30.     In November 2020, Karl Murphy, Spiffy's Co-Founder and President, flew out to meet the Sierts and their then business partners, the Sablans, to tour Spiffy's Bay Area corporate site and take them to lunch with the regional manager, Celestin Tiffany.

31.     Both the Sierts and the Sablans have a long history of giving back to their local and global communities in areas such as countering homelessness, empowering women, and children, and fighting human trafficking.

32.     Not surprisingly, at this meeting the Sierts and Sablans shared with Murphy their vision of their LLC, All Four Him, particularly the ability to use their business as a platform to support social causes and glorify God.

33.     Murphy assured the Sierts of Spiffy's credibility, its mission, its commitment to the environment, and its goal of giving people back a portion of their life by eliminating the inconvenience of car maintenance.

34.     Murphy even went so far as to share his expectation that Spiffy would become the "Amazon of car care," confidently stating that there was so much customer demand that they could not keep up with it.

35.     To further the illusion of the inevitability of Spiffy's success, Murphy took the Sierts and Sablans on a tour of Spiffy's supposedly highly profitable "City Business Unit" ("CBU") in San Francisco.

36.     According to Murphy, the "crown jewels" of Spiffy's San Francisco CBU was unquestionably Waymo, Google's autonomous driving technology company, as well as Enterprise Rent-A-Car, and U-Haul, among others.

37.     As the Sierts later learned (too late), in reality Spiffy was fraudulently inflating invoices to Waymo to increase profitability. Waymo eventually discovered Spiffy was charging them for an additional service, decontamination, which it was not receiving. As a result, Waymo terminated Spiffy's services.

6
COMPLAINT

38.     As negotiations between the Siers and Spiffy progressed, Spiffy continued to entice the Siers with bigger and better promises: that Spiffy had a bevy of accounts for the San Jose market in the pipeline, as reflected in the Memorandum of Understanding contained in the Franchise Disclosure Documents ("FDD"); and that the Siers would be assigned all of Spiffy's "lucrative" national accounts in their territory, including Spiffy's "biggest" client, Enterprise Rent-A-Car ("Enterprise").

39.     As a result of Defendants' fraudulent misrepresentations and concealed material facts, the Siers agreed to become a Spiffy franchisee and formed A4H to operate as a Spiffy franchisee. Plaintiffs signed the Franchise Agreement on December 19, 2020.

40.     As Plaintiffs went through the process of reviewing financial projections, Connor Finnegan, Spiffy's VP of Strategy, was heavily involved.

41.     In a text exchange on January 19, 2021, he made several comments regarding higher revenue numbers in Year 1, while also lowering estimates for other expense assumptions (e.g., storage, payment processing fees, accounting fees, legal fees, gasoline, etc.).

42.     Although A4H had received financial preapproval through FranFund, a company specializing in securing funding for prospective franchisees, FranFund insisted on completely vetting Spiffy. However, Spiffy would only share its financials in terms of gross revenue.

43.     Further, when asked about projected decreases in revenue, Spiffy blamed "seasonality" as the only factor.

**B.      Spiffy's Continued Its Fraudulent and Misleading Business Practices**

**i.      Spiffy Vans**

44.      Both Murphy and Finnegan consistently represented to Plaintiffs that the key to success was having as many Spiffy service vans as possible.

45.     The Spiffy Vans had "uplifts" that could only be performed by Spiffy, who would then essentially lease them back to Franchisees via Mike Albert Fleet Solutions ("Mike Albert").

46.     For example, Mike Albert would "pay" Spiffy directly for the uplift (e.g., $26,000 per van) even though the actual cost of the uplift is an estimated $8,000 to $10,000.

47. The Spiffy franchisees would then lease the van from Mike Albert, who would amortize the cost of the uplift as part of the Franchisee's monthly payment, thereby inflating the monthly payments to approximately $1,200 per month per van.

48. To add insult to injury, the Spiffy vans turned out to be mechanical nightmares, as Plaintiffs, along with many other Spiffy franchisees, were forced to bring their vans to third-party servicers after Spiffy failed to resolve a significant issue preventing correct oil suction for oil changes and water reclamation.

49. The consensus from third-party servicers was that Spiffy's "uplift" was done with cheap parts, as well as being unnecessary and overly complicated.

**ii.** **Spiffy Fleet Accounts**

**a.** **Enterprise Rent-a-Car**

50. A4H was contractually obligated to service all Spiffy national accounts, especially Enterprise Rent-a-Car ("Enterprise"), and perform preventative maintenance services, which included oil changes and tire rotations.

51. Indeed, these fleet accounts were a major selling point for Spiffy, who enticed franchisees like Plaintiffs with promises of endless profits derived from servicing wave after wave of Enterprise vehicles.

52. However, shortly after beginning operations as a Spiffy Franchisee, Plaintiffs began to realize that while Enterprise may be a boon for Spiffy corporate, it would prove to be a loss leader for them.

53. In fact, the loss from servicing Enterprise vehicles was so severe that Plaintiffs requested that they be permitted to cease servicing Enterprise's home branch locations in Santa Cruz and Gilroy.

54. Plaintiffs offered to share with Spiffy their financial analysis demonstrating the consistent losses, but Spiffy refused to even look at it.

55. On January 11, 2022, Plaintiffs were advised by Mike Tolzman ("Tolzman"), VP of Franchising, that Plaintiffs had no choice but to serve all Enterprise locations in their "territory," or

8

COMPLAINT

Spiffy would take the Enterprise fleet account as whole (representing 70% of the Plaintiffs' business).

56.   Ultimately, Plaintiffs were forced to stop servicing Enterprise.

57.   Plaintiffs had accrued a $30,000 oil bill they could not pay due to lack of profit from these services and as a result could no longer supply oil for oil changes.

**b.   U-Haul**

58.   U-Haul was another national fleet account frequently touted by Spiffy as a strong source of revenue for Spiffy franchisees, including Plaintiffs. Among the services provided to U-Haul was a "Wash Package" which was described as follows:

> Service: U-Haul Custom Spiffy Oil Change and Wash with Seat Shampoo Performed on: Cargo Vans and Pick-up Trucks Wash & Dry Exterior of vehicle Dress all Exterior Trim and Tires Clean interior of vehicle to include: High Pressure air blowout of all nooks and crannies Vacuum Windows Thorough cleaning with light degreaser of dash, door panels, consoles and floor *Shampoo seats and seat belt straps Remove and scrub rear cargo mat/bed liner blow out dirt and debris from beneath cargo mat/bed liner area Change Oil and filter (synthetic blend used) *No Renew-All, petroleum shine or conditioning products on the interior of vehicles Your price for this service is $94.00 flat rate per vehicle Notes: Pictures required Mileage sticker inside Ordered via portal by U-Haul *additional charges may apply for vehicles that are excessively dirty. All additional charges are negotiated prior to services being completed.

59.   Spiffy, however, apparently felt that this service provided too much value for the price.

60.   Therefore, on May 17, 2021, Spiffy sent Charley Va, Spiffy's SFO supervisor, to meet with A4H's then General Manager, Eric Sablan, to show him various "shortcuts" for the "Wash Package," including: no shampoo, only a quick wipe down, no cleaning of the rooftop, etc.

61.   The purpose of these "shortcuts" was to quickly complete U-Haul service appointments while still charging full price.

**c.   Amazon**

62.   In the summer of 2022, Plaintiffs began servicing Amazon vehicles for Amazon Delivery Service Partners ("DSPs") via their mobile van service.

9

63.     At the time they began working with Amazon, Spiffy assured Plaintiffs they would have approval within months to allow their team to work on Amazon's site. Until then, according to Andrew Joo ("Joo"), Spiffy's Director of Business Development for Amazon, Plaintiffs would have to "make do" by working in parking lots and any other public area they could find. The ability to work on-site is important, as it increases efficiency and promotes safety.

64.     Joo continued to make promises that Amazon was going to be very lucrative, going as far as to state on September 9, 2022, "Overall the meeting with Amazon went very well. If you are patient, it will be very worth your while." However, after months of waiting patiently and working in off-site lots, on-site work was never approved.

65.     Moreover, the servicing of Amazon delivery vehicles required specific training.

66.     Part of Spiffy's responsibility, as noted in the "Amazon Playbook," is to train franchise staff appropriately.

67.     However, the Spiffy Amazon Trainer, Nathan Sallee ("Sallee"), frequently cut corners with Franchisee training, often sending brusque text messages to "explain" important service elements or advising Franchisees to use "YouTube" to figure out the correct way to service vehicles.

68.     This lack of training and advisement ranged from relatively minor service issues to safety recalls.

69.     Eventually, Sallee virtually stopped responding to Plaintiffs' questions and inquiries. Feeling completely out of their depth and unwilling to continue to incur the risks of servicing vehicles without proper training, Plaintiffs were forced to substantially limit the services provided to Amazon DSPs, before eventually ceasing to provide services altogether.

**iii.     Spiffy's Accounting Practices**

70.     Spiffy receives payment directly from the customer and then issues payment to the Spiffy franchisees for their portion of the earned fees.

71.     With respect to fleet accounts, the customer is generally on a "Net 15" basis, meaning that payments are due within fifteen days of receipt of the bill or invoice.

72.     However, in the case of each Spiffy franchisee, there have been, and continue to be, widespread and repeated instances where a fleet customer as complied with Spiffy's "Net 15" requirement and issued timely payment, but Spiffy delays paying their franchisees their portion, sometimes for weeks, sometimes for months, and sometimes not at all.

73.     This practice is representative of Spiffy's policy of placings its corporate needs above those of Spiffy franchisees.

**iv.     Spiffy's Sales & Marketing Tactics**

74.     Spiffy sales and marketing support has ranged from the useless to the nonexistent.

75.     In order to generate interest in the company's services, Spiffy corporate negotiated ridiculously low rates with customers, particularly fleet customers.

76.     When they became a franchisee, Plaintiffs were forced to service these customers for months at a significant loss.

77.     Plaintiffs also quickly learned that Murphy's statement that there was so much customer demand for Spiffy services that they "couldn't keep up with it" was patently untrue.

78.     There was hardly any consumer demand for Spiffy's services, despite what Murphy told Plaintiffs.

79.     In addition, the lack of brand awareness was clear. No one knew of Spiffy. All of Spiffy's efforts at marketing yielded, at best, a few customer leads from Google, most of which never materialized into actual customers.

**C.     Spiffy's Practices Forced A4H to Cease Operations**

80.     After nearly two years of trying to keep their franchise afloat despite Spiffy's best efforts to contrary, Plaintiffs finally had enough and wanted out.

81.     In desperation, Plaintiffs contacted Spiffy to inquire about a buyout, but their request was rebuffed.

82.     However, Spiffy advised Plaintiffs that another Spiffy franchisee in the East Bay (within the A4H's general area) would perhaps be interested in acquiring A4H's territory.

83. Based on that information, Plaintiffs arranged a meeting with the East Bay Franchisees.

84. At that meeting, Plaintiffs learned that Spiffy had already contacted the East Bay Franchisees and informed them of Plaintiffs' struggling franchise.

85. Spiffy's unauthorized and unwarranted communication with the East Bay Spiffy franchise owners blatantly sabotaged and undercut A4H's efforts to sell the business.

86. As a result, Plaintiffs' meeting with the East Bay potential franchisees did not result in any kind of negotiation; rather, it was assumed that the East Bay potential franchisees would simply "take over" A4H's operations without paying any compensation.

87. Plaintiffs persevered for as long as they could, but ultimately, were forced to cease operations on June 5, 2023.

**D.     Spiffy's Fraudulent Misrepresentations**

88. It is now abundantly clear that Plaintiffs, like many other Spiffy franchisees, were induced by Defendants through blatant misrepresentations and concealed material facts to become franchisees.

89. Defendants' false and fraudulent statements include, but are not limited to:

a. Spiffy had a fully formulated and thoroughly tested business model, strategy and service concept that was both achievable, sustainable, and profitable.

b. Spiffy-negotiated National Accounts were profitable for franchisees to service.

c. Spiffy would not arbitrarily compete with its franchisees and undermine the value of the franchise.

d. Spiffy had substantial resources and infrastructure available to support inexperienced franchisees.

e. No prior experience was needed to operate the Spiffy franchise successfully.

f. Spiffy had an existing marketing campaign tailored not only to the business, but to the expertise of the franchisees, and the geographic scope of the franchise network.

g. The Spiffy franchise required an investment appropriate for the opportunity.

90.     Plaintiffs would not have entered into the Spiffy Franchise Agreement had they known the truth. Indeed, these falsehoods were a substantial factor in inducing Plaintiffs to invest in Spiffy in the first place.

91.     Had the foregoing represented the extent of Defendants' wrongdoing, Plaintiffs would unquestionably be entitled, at minimum, to have the Franchise Agreement rescinded, and to be restored to the financial position they would have been in without the misconduct of Spiffy.

92.     However, Defendants' misconduct extends much further.

93.     Apparently not content with limiting itself to direct misrepresentations to potential franchisees, Spiffy's FDD filed with various states' regulatory agencies, and therefore presumed accurate, made the direct misrepresentations appear even more believable.

94.     However, it is now apparent that many of the state regulatory filings contain material misrepresentations and failed to include key information otherwise communicated to Plaintiffs.

95.     As just one example, while the franchise documents speak to National Accounts, reserving to Spiffy the right to negotiate and dictate the price at which services to such accounts would be provided, at no point do the documents disclose that servicing National Accounts would be at a loss to Plaintiffs.

96.     Moreover, failure to service such accounts at a loss would void the A4H's territorial exclusivity.

97.     Under the California Franchise Investment Law, it is "unlawful for any person willfully to make any untrue statement of a material fact in any application, notice or report filed with the commissioner under this law, or willfully to omit to state in any such application, notice, or report any material fact which is required to be stated therein, or fail to notify the commissioner of any material change as required by Section 31123." California Corporations Code Sec. 31200. Similarly, Section 31201 prohibits misrepresentations and/or omissions made to franchisees.

98.     Defendants' misconduct, violating the laws of several states, is also prohibited by Federal law. For example, it is an unfair or deceptive act or practice in violation of Section 5 of the Federal

13
COMPLAINT

Trade Commission Act ("FTC Act") for any franchise seller covered by part 436 to: (a) Make any claim or representation, orally, visually, or in writing, that contradicts the information required to be disclosed by this part."

99.     Defendants' actions also violate the FTC's Trade Regulation Rule entitled "Disclosure Requirements and Prohibitions Concerning Franchising," as amended (the "Franchise Rule").

100.     The Franchise Rule helps prospective entrepreneurs evaluate the risks and benefits of a franchise opportunity.

101.     In marketing and selling Spiffy franchises, Defendants failed to comply with the Franchise Rule in several respects.

102.     Among other things, Defendants failed to include key information to enable Plaintiffs and other Spiffy franchisees to analyze earning representations in the disclosure documents.

103.     Worse, Defendants misguided Plaintiffs through representations in the documents that contradicted other statements they made to prospective franchisees.

104.     Further troubling is Defendants' inconsistent treatment of the franchisees, which seems oriented less toward their success and more toward maximizing royalty income to Spiffy at all costs.

105.     For example, Spiffy has allowed some franchises to depart from certain provisions of the franchise agreements (e.g., the use of particular vendors/distributors) while requiring other franchises to adhere strictly to all terms of the agreements.

106.     Upon information and belief, Spiffy received undisclosed direct financial benefits from certain vendors/distributors in exchange for directing business from the Spiffy franchises.

107.     Upon information and belief, Spiffy is withholding earned fees from franchisees in order to address shortcomings in its own liquidity needs.

## FIRST CLAIM FOR RELIEF

### Fraudulent Inducement

### (Against All Defendants)

108.     Plaintiffs incorporate by reference and reallege each and every allegation contained in the

paragraphs above as though fully set forth herein.

109.    To induce Plaintiffs to purchase a franchise, Defendants made numerous affirmative misrepresentations regarding the franchise being offered to Plaintiffs, including the false statements in the FDD set forth above.

110.    Defendants also made, inter alia, the following misrepresentations: (1) they would provide Plaintiffs with supervision, training, assistance, guidance, proprietary education, and services related to the operation of the Spiffy franchise; (2) Spiffy would provide Plaintiffs with training, products, supplies, equipment, advertising, and promotion; (3) a Spiffy franchise is a low investment, that franchisees could operate efficiently with minimal labor; (4) Defendants represented that the Spiffy franchise network is successful and has established standards; (5) the costs of ownership of the franchises; (6) Spiffy had a fully formulated and thoroughly tested business model, strategy and service concept that was both achievable, sustainable, and profitable; (7) Spiffy-negotiated National Accounts were profitable for franchisees to service; (8) Spiffy would not arbitrarily compete with its franchisees and undermine the value of the franchise; (9) Spiffy had substantial resources and infrastructure available to support inexperienced franchisees; (10) No prior experience was needed to operate the Spiffy franchise successfully; (11) Spiffy had an existing marketing campaign tailored not only to the business, but to the expertise of the franchisees, and the geographic scope of the franchise network; and (12) The Spiffy franchise required an investment appropriate for the opportunity.

111.    Defendants knew the representations were false at the time they were made or made the representations recklessly and without regard for the truth.

112.    Defendants intended that Plaintiffs would rely on the representations to secure their business as Spiffy franchisees.

113.    Plaintiffs reasonably relied upon the representations in deciding to purchase a franchise from Spiffy and in signing the Franchise Agreement.

114.    Plaintiffs' reliance was reasonable and justifiable, as they had no reason to question or doubt Defendants' intentions.

115.    Plaintiffs' reliance on Defendants' representations was a substantial factor in causing them harm.

116.    As a result of its reliance on Defendants' representations, Plaintiffs have been damaged in an amount to be determined at trial but believed to be in excess of $1,500,000.

117.    Defendants' actions were willful, wanton, malicious, and oppressive such as to entitle Plaintiffs to punitive damages in an amount according to proof at trial but believed to be in excess of $4,500,000.

118.    Defendants' actions also constitute malice, oppression, and/or fraud as defined under California Civil Code section 3294. Accordingly, Plaintiffs are entitled to receive punitive damages in an amount sufficient to punish Defendants and to deter similar future conduct.

<u>**SECOND CLAIM FOR RELIEF**</u>

**Negligent Misrepresentation**

**(Against All Defendants)**

119.    Plaintiffs incorporate by reference and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

120.    Defendants made numerous misrepresentations, both written and verbal communications with Plaintiffs.

121.    Defendants represented to Plaintiffs that these misrepresentations were true.

122.    Defendants' misrepresentations were not true.

123.    Although Defendants may have honestly believed the misrepresentations were true, they had no reasonable grounds for believing they were true when they made them.

124.    Defendants intended that Plaintiffs rely on the misrepresentations to secure their business as Spiffy franchisees.

125.    Plaintiffs reasonably relied on Defendants' misrepresentations.

126.    Plaintiffs' reliance on Defendants' representations was a substantial factor in causing them harm.

COMPLAINT

127.     Plaintiffs were damaged, in an amount to be determined at trial believed to be in excess of $1,500,000, as a result of reasonably relying on Defendants' misrepresentations.

## THIRD CLAIM FOR RELIEF

### Fraudulent Concealment

### (Against All Defendants)

128.     Plaintiffs incorporate by reference and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

129.     Defendants had an affirmative duty under the U.S. Federal Trade Commission's Franchise Rule and CFIL to make certain disclosures to Plaintiffs in their FDD, and Defendants willfully failed to make all of the required disclosures to Plaintiffs. Defendants also willfully omitted material facts that were necessary in order to make other statements made by them, in the light of the circumstances under which they were made, not misleading.

130.     For instance, in its FDD, Defendants failed to disclose the estimate of Plaintiffs' initial investment to operate the franchise, including that the initial investment estimate might be low, or that it could fluctuate depending on higher costs for certain items.

131.     Further, Defendants failed to disclose that Spiffy was fraudulently inflating invoices to Waymo to increase profitability, including charging Waymo for additional services that Spiffy was not performing. Defendants touted Waymo, Enterprise Rent-A-Car, and U-Haul, among others, as a significant factor in Spiffy's profitability when Defendants knew that the profitability was caused by Defendants' fraudulent misrepresentations to Google.

132.     Defendants also failed to disclose that Plaintiffs would be forced to service national accounts at a loss.

133.     Defendants knew the information they did not disclose in the FDD, and that other facts not shared with Plaintiffs, were material and that Plaintiffs were likely to rely on Defendants' intentional failure to disclose those facts.

134.     Plaintiffs did not know of the concealed and omitted facts.

135.     Defendants intended to deceive Plaintiffs by concealing the foregoing facts. Had Defendants disclosed the concealed facts, Plaintiffs would not have signed the Franchise Agreement and would not have entered into the franchise relationship with Spiffy.

136.     Plaintiffs harmed in numerous ways, including, but not limited to, spending significant amounts of time and money on their franchise they otherwise never would have purchased.

137.     Defendants' concealment was a substantial factor in causing Plaintiffs' harm.

138.     Plaintiffs were damaged in an amount to be determined at trial believed to be in excess of $1,500,000.

139.     Defendants' actions were willful, wanton, malicious, and oppressive such as to entitle Plaintiffs to punitive damages in an amount according to proof at trial but believed to be in excess of $4,500,000.

140.     Defendants' actions also constitute malice, oppression, and/or fraud as defined under California Civil Code section 3294. Accordingly, Plaintiffs are entitled to receive punitive damages in an amount sufficient to punish Defendants and to deter similar future conduct.

## FOURTH CLAIM FOR RELIEF

### Violation of CFIL – California Corporations Code §§ 31000 et seq.

### (Against All Defendants)

141.     Plaintiffs incorporate by reference and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

142.     The CFIL makes it "unlawful for any person willfully to make any untrue statement of a material fact in any application, notice or report filed with the commissioner under this law, or willfully to omit to state in any such application, notice, or report any material fact which is required to be stated therein, or fail to notify the commissioner of any material change as required by Section 31123." Cal. Corp. § 31200

143.     Defendants violated Section 31110 of the CFIL by selling to Plaintiffs a franchise using a FDD that did not comply with federal law or the CFIL.

144.   Defendants violated Section 31200 of the CFIL by failing, in the FDD filed with the Department of Business Oversight, to disclose material facts that were required to be disclosed in the FDD, and by making untrue statements of material fact in the FDD.

145.   Defendants violated Sections 31201 and 31202 of the CFIL by willfully making untrue statements of a material fact in the FDD that was given to Plaintiffs, and by willfully omitting to state in its FDD material facts that were required to be stated in the FDD.

146.   The Individual Defendants materially aided Spiffy in violating the CFIL in the ways enumerated above, and therefore are jointly and severally liable with Spiffy for those violations pursuant to Section 31302 of the CFIL.

147.   Plaintiffs were harmed by Spiffy's violations of the CFIL, in an amount to be determined at trial believed to be in excess of $1,500,000.

## FIFTH CLAIM FOR RELIEF

### Violation Of California Business and Professions Code Section 17200 et seq.

### (Against All Defendants)

148.   Plaintiffs incorporate by reference and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

149.   By their wrongful acts and omissions, Defendants engaged in unfair, unlawful, and/or fraudulent business practices in violation of Section 17200.

150.   Defendants made numerous material misrepresentations about the Spiffy franchise in order to bait prospective franchisees, including Plaintiffs, into joining the Spiffy system. Once baited, Defendants required Plaintiffs to execute boilerplate contracts of adhesion in the form of the Franchise Agreement, offering merely illusory negotiation power despite Plaintiffs' lack of genuine opportunity to negotiate substantive terms. After obtaining Plaintiffs' signatures, collecting initial franchise fees, and locking Plaintiffs into multi-year contracts, Defendants shirked their agreed-to obligations under the Franchise Agreement, including but not limited to providing supervision, training, assistance, support, and other services. Defendants' wrongful acts and omissions precluded Plaintiffs from developing

COMPLAINT

successful businesses. The foregoing conduct is exactly the kind of unfair, unlawful, and/or fraudulent conduct that Section 17200 seeks to prevent.

151.    Plaintiffs are informed and believe, and on that basis allege, that Defendants also engaged in the unfair, unlawful, or fraudulent behavior of receiving kickbacks from vendors that were not disclosed to Plaintiffs.

152.    Defendants' wrongful acts and omissions as alleged have allowed them to reap unfair benefits and make substantial sales and profits while Plaintiffs struggled to run profitable their Spiffy franchise. As a result of Defendants' unfair, unlawful, and/or fraudulent business practices, Plaintiffs have been injured and has suffered and will continue to suffer substantial damages, including being deprived of making their own sales and profits, in an amount to be determined at trial.

153.    As a result of Defendants' unfair, unlawful, and/or fraudulent business practices, Plaintiffs have suffered and, in the absence of injunctive equitable relief, will continue to suffer irreparable harm, that cannot readily be remedied by damage remedies. Plaintiffs seek restitution from Defendants pursuant to Business and Professions Code section 17203 in an amount to be proven at trial, including, but not limited to, an order against Defendants granting all profits arising from their unlawful conduct to Plaintiffs.

154.    Because Plaintiffs have no adequate remedy at law for Defendants' continuing violation of their stated rights, they seek preliminary and permanent injunctive relief against Defendants as needed to protect their interests.

155.    Plaintiffs further seek an order freezing Spiffy's assets or imposing a constructive trust over all monies and assets in Defendants' possession that rightfully belong to Plaintiffs.

### SIXTH CLAIM FOR RELIEF

**Violation Of California Business and Professions Code Section 16600 et seq.**

**(Against Spiffy)**

156.    Plaintiffs incorporate by reference and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

157.    California Business and Professions Code section 16600 declares that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

158.    Despite non-competition clauses being void in California, Spiffy maliciously and improperly included a covenant not to compete in the Franchise Agreement.

159.    The use of a covenant not to compete is an unfair business practice under California law.

160.    As a result of Spiffy's conduct, Plaintiffs have suffered, and continue to suffer, damages in an amount to be determined at trial believed to be in excess of $1,500,000.

161.    Plaintiffs are entitled to legal fees and costs as allowed by law.

## SEVENTH CLAIM FOR RELIEF

### Breach of Contract

### (Against Spiffy)

162.    Plaintiffs incorporate by reference and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

163.    Under the Franchise Agreements, Spiffy undertook multiple contractual obligations. As detailed above, these obligations relate to, inter alia, National Accounts; Service Vehicles; Training Program; Operations Manuals; Selecting Vendors; Advertising and Promotion; and Pricing. Despite agreeing to these obligations, Spiffy failed to meet them.

164.    Throughout the course of its franchise relationship with Plaintiffs and after, Spiffy did not fulfill and breached its contractual obligations and promises.

165.    Plaintiffs performed all, or substantially all, of the promises, conditions, and covenants agreed to be performed pursuant to the terms of the Franchise Agreement, except for any and all promises, conditions, and covenants excused by the acts and omissions of Spiffy.

166.    Any and all conditions for Plaintiffs' performance had occurred or were waived or excused.

167.    As a proximate result of Spiffy's breach, Plaintiffs have lost the benefit of their bargain

21

COMPLAINT

and suffered damages.

168.   Plaintiffs have been harmed and have suffered and will continue to suffer substantial damages in an amount to be proven at trial believed to be in excess of $1,500,000.

169.   Spiffy's breach of the Franchise Agreement was a substantial factor in causing Plaintiffs' harm.

## EIGHTH CLAIM FOR RELIEF

### Breach of Implied Covenant of Good Faith and Fair Dealing

### (Against Spiffy)

170.   Plaintiffs incorporate by reference and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

171.   Contained in the Franchise Agreement is an implied covenant of good faith and fair dealing requiring Spiffy to avoid undertaking actions that would injure or prejudice Plaintiffs' rights, or to otherwise act so as to deprive Plaintiffs of the benefits arising under the Franchise Agreements.

172.   Spiffy breached the terms of the Franchise Agreement by its actions as alleged herein, all to the detriment and damage of A4H.

173.   Specifically, Spiffy refused to provide Plaintiffs with supervision, assistance, and services necessary to allow them to receive the benefits of the Franchise Agreement.

174.   Further, Spiffy, by and through other Individual Defendants, commingled funds that were required either to be spent on advertising or placed in a separate franchisee advertising account.

175.   By so acting, Spiffy, and the Individual Defendants acting on its behalf, did not act fairly and in good faith and breached the implied covenant of good faith and fair dealing contained within the Franchise Agreement.

176.   Plaintiffs have been harmed by Spiffy's conduct, and the conduct of the Individual Defendants acting on its behalf. Plaintiffs have suffered and will continue to suffer substantial damages in an amount to be proven at trial believed to be in excess of $1,500,000.

//

**NINTH CLAIM FOR RELIEF**

**Accounting**

**(Against Spiffy)**

177.    Plaintiffs incorporate by reference and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

178.    A contractual relationship existed between A4H and Spiffy.

179.    A4H is unable to determine the exact amount of money owed to it by Defendants as a result of their conduct, as alleged in this claim, without an accounting.

180.    Having violated Business and Professions Code section 20020, and pursuant to section 20035, A4H is entitled to receive from Defendants the fair market value of the franchised business and franchise assets and any other damages caused by the violation. To accurately determine these damages, an accounting is necessary.

181.    Spiffy has not charged A4H correct royalties.

182.    Despite Plaintiffs' requests, there has been no proper accounting or examination of Spiffy's books and records sufficient to analyze its accounting practices and methods.

183.    Accordingly, Plaintiffs request an accounting of all unsettled accounts between A4H and Spiffy.

**TENTH CLAIM FOR RELIEF**

**Rescission**

**(Against Spiffy)**

184.    Plaintiffs incorporate by reference and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

185.    Plaintiffs entered into the Franchise Agreement based upon the fraudulent representations of Defendants as alleged herein.

186.    Due to Defendants' fraudulent misrepresentations, and due to Defendants' knowing violation of the CFIL, Plaintiffs are entitled to rescind the Franchise Agreement and have done so

23

COMPLAINT

appropriately.

## ELEVENTH CLAIM FOR RELIEF

### Intentional Infliction of Emotional Distress

### (Alina Siert Against All Defendants)

187.    Plaintiffs incorporate by reference and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

188.    Alina claims that Defendants' conduct caused her to suffer severe emotional distress.

189.    Defendants' conduct toward Alina was extreme, outrageous, and intended to cause her emotional distress. Defendants were fully aware that treating Alina in the manner alleged above, including, but not limited to, fraudulently inducing her to leave her previous gainful employment, to stake her financial future and security, and to incur the extreme debt obligations based on the misrepresentations of Spiffy's success, would cause her emotional distress and Defendants engaged in such conduct regardless.

190.    As a direct result of Defendants' extreme and outrageous conduct, Alina suffered severe emotional distress, mental and physical pain, and anguish.

191.    Defendants' conduct was a substantial factor in causing Alina's severe emotional distress thereby entitling her to general damages, special damages, and compensatory damages in an amount to be determined at trial but believed to be no less than $500,000.

192.    By engaging in the conduct described herein, Defendants acted fraudulently, oppressively, malicious and with a willful and conscious disregard of Alina's rights. Accordingly, Alina is entitled to exemplary and punitive damages pursuant to California Civil Code § 3294.

## TWELFTH CLAIM FOR RELIEF

### Violation of the Racketeer Influenced and Corrupt Organizations Act – 18 U.S.C. § 1961 et seq.

### (Against All Defendants)

193.    Plaintiffs incorporate by reference and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

24

COMPLAINT

194. Plaintiffs are informed and believes, and on that basis alleges, that Defendants, and each of them, as well as unnamed third parties, conspired to, and engaged in, a pattern of racketeering activity within the last five years by engaging in two or more instances of illegal conduct in connection with their dealings with franchisees, especially with Plaintiffs.

195. Defendants have violated 18 U.S.C. §1962(c) because they have conducted the affairs of an enterprise through a pattern of racketeering activity.

196. The predicate crimes committed by Defendants include, but are not limited to, money laundering, racketeering, use of the U.S. mails to conduct transactions (mail fraud, as defined by 18 U.S.C. §1341), use of telephonic or other wires in carrying out transactions (wire fraud, as defined by 18 U.S.C. §1343), obstruction of justice, and other prohibited activities.

197. Further, in violation of 18 U.S.C. §1341 and 18 U.S.C. §1343, Defendants devised and effected a scheme to defraud Plaintiffs and to obtain money from Plaintiffs by means of fraudulent pretenses. Specifically, Defendants, and each of them, fraudulently induced Plaintiffs, and other franchisees, to purchase businesses by intentionally misrepresenting material information to Plaintiffs, and other franchisees, including the financial prospects of the franchisees.

198. The execution of the scheme to defraud by Defendants involved numerous individual instances of the use of the United States mails and interstate wire facilities in furtherance of the scheme, which uses United States mails and interstate wire communications were reasonably foreseeable by Defendants.

199. Specific instances include: Plaintiffs received shipments or deliveries of products in connection with the Franchise Agreement, where said goods were delivered via the United States mails and/or private carriers; Plaintiffs received electronic mail and text messages from Defendants relating to the Franchise Agreement.

200. The predicate acts committed by Defendants as alleged herein constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. §1961(5). Specifically, the acts of mail fraud and wire fraud as alleged herein are related because they involve repeated instances of using the United

States mails and interstate wire facilities while repeatedly making misrepresentations regarding Plaintiffs' Petland store. Additionally, based on information and belief, other Spiffy franchisees across the United States, current and past, have also been victimized by this fraudulent scheme.

201.    Defendants constitute persons that have violated 18 U.S.C. § 1961, et seq. in relationship to the enterprise, which is the Spiffy franchise system., acting as an association-in-fact.

202.    Defendants' actions constitute a pattern of racketeering activity in violation of 18 U.S.C. § 1961, et seq., in that Defendants' violations of this statute are system wide.

203.    The actions of Defendants, and each of them, as alleged herein, were taken with the intent of deceiving Plaintiffs and defrauding them in an amount to be determined at trial. In addition, the criminal actions of Defendants, and each of them, have had the effect of harming Plaintiffs' pecuniary interests.

204.    As a direct and proximate result of the above actions of Defendants, and each of them, Plaintiffs have suffered harm entitling them to compensatory, punitive, and treble damages pursuant to 18 U.S.C. §1964 in an amount according to proof at trial.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff A4H prays for judgment and an award against Defendants as follows:

1.    For general, special, and compensatory damages according to proof at trial, but believed to be in excess of $1,500,000;

2.    For punitive and exemplary damages in an amount according to proof at trial, but believe to be in excess of $4,500,000;

3.    For pre- and post-judgment interest at the maximum rate allowed by law;

4.    For an accounting as alleged herein;

5.    For a preliminary injunction and permanent injunction against all Defendants;

6.    For compensatory, punitive, and treble damages pursuant to 18 U.S.C. §1964 in an amount according to proof at trial;

7.    For the recovery of reasonable attorneys' fees;

COMPLAINT

8.    For the costs of this suit; and

9.    For such other and further relief as the Court may deem just and proper.

WHEREFORE, Plaintiff Alina Siert prays for judgment and an award against Defendants as follows:

1.    For general, special, and compensatory damages according to proof at trial, but believed to be in excess of $500,000;

2.    For punitive and exemplary damages in an amount according to proof at trial, but believe to be in excess of 1,500,000;

3.    For pre- and post-judgment interest at the maximum rate allowed by law;

4.    For the recovery of reasonable attorneys' fees;

5.    For the costs of this suit; and

6.    For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,
**DRUVEN PC**

Date: March  21   2024

By: _____
Jeffrey C. Mayes
Ioana R. Răducu

Attorneys for Plaintiffs,
A4H, LLC, a California Limited Liability
Company; Alina Siert, an individual

27
COMPLAINT